90 N.J. Super. 245 (1966)
217 A.2d 141
CITY OF BAYONNE, A MUNICIPAL CORPORATION OF NEW JERSEY, AND MICHAEL F. BONNER, PLAINTIFFS,
v.
DWIGHT R.G. PALMER, COMMISSIONER OF THE STATE HIGHWAY DEPARTMENT OF NEW JERSEY; CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION OF NEW JERSEY; LEHIGH VALLEY RAILROAD, A CORPORATION OF PENNSYLVANIA; PENNSYLVANIA RAILROAD COMPANY, A CORPORATION OF PENNSYLVANIA; JOHN A. KERVICK, TREASURER OF THE STATE OF NEW JERSEY; BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, AN AGENCY OF THE STATE OF NEW JERSEY; AND ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS. TOWNSHIP OF HILLSIDE, IN THE COUNTY OF UNION, A MUNICIPAL CORPORATION, ANTHONY TITTEL, ROSEMARY TITTEL, SIDNEY KLEIMAN AND LENA KLEIMAN, PLAINTIFFS,
v.
JOHN A. KERVICK, TREASURER OF THE STATE OF NEW JERSEY; DWIGHT R.G. PALMER, COMMISSIONER OF THE STATE HIGHWAY DEPARTMENT; CENTRAL RAILROAD COMPANY OF NEW JERSEY, A NEW JERSEY CORPORATION; LEHIGH VALLEY RAILROAD, A PENNSYLVANIA CORPORATION; PENNSYLVANIA RAILROAD COMPANY, A CORPORATION OF PENNSYLVANIA, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 4, 1966.
*249 Mr. Joseph Harrison and Mr. Joseph M. Jacobs for plaintiffs City of Bayonne and Michael Bonner, (Messrs. Harrison and Jacobs, attorneys).
Mr. A. Howard Finkel for plaintiffs Township of Hillside, Anthony Tittel, Rosemary Tittel, Sidney Kleiman and Lena Kleiman.
Mr. Alan B. Handler, First Assistant Attorney General, for defendants Dwight R.G. Palmer, John A. Kervick, Board of Public Utility Commissioners and Arthur J. Sills, Attorney General, (Mr. Arthur J. Sills, Attorney General, attorney).
*250 Mr. Stephen B. Wiley for defendants Central Railroad Company of New Jersey, Pennsylvania Railroad Company and Lehigh Valley Railroad, (Mr. Edwin C. Landis, Jr., Mr. G. Douglas Hofe, Jr., and Mr. John B.M. Frohling on the brief; Messrs. Meyner and Wiley, attorneys).
MATTHEWS, J.S.C.
This is a consolidation of two essentially similar civil actions. One was instituted by the City of Bayonne and a resident and taxpayer of the city. The other was instituted by the Township of Hillside and four resident property owners and taxpayers thereof. The actions have been consolidated. The two actions generally question the constitutionality of two acts of the Legislature and the validity of certain contracts between the defendant Commissioner and the defendant railroads executed under those statutes. The complaints also ask judgment enjoining certain activities carried on under the statutes and contracts, and ask an adjudication of the rights of certain of defendants under the statutes in question and related laws.
In general, all of the contentions in these actions pertain mainly to a rail rerouting program which is popularly known as the "Aldene Plan." In gross, this is a track interconnection plan to route the Central Railroad Company of New Jersey commuters into the Pennsylvania Railroad Company station in Newark to connect there with the Port Authority Trans-Hudson Corporation (PATH) rapid transit system running between New Jersey and New York.
The two major statutes in question are L. 1962, c. 191, N.J.S.A. 48:12A-17 et seq., which authorized the Commissioner of the State Highway Department and the Division of Railroad Transportation to enter into contracts to implement the Aldene Plan, appropriating $3,000,000 therefor, and L. 1964, c. 88, N.J.S.A. 48:12A-16.1 et seq., which replaced the basic 1960 statute on railroad passenger service contracts with an expanded authorization to take action to preserve and improve rail passenger service. The capital improvement contracts in question were executed under the authority of *251 the first of the two statutes, i.e., L. 1962, c. 191, and provided for the implementation of the Aldene Plan.
At the suggestion of the court, and with the consent of counsel, this matter has come up on cross-motions by the parties for summary judgment. The court is requested to decide the matter on the basis of (a) the exhibits filed with the court, (b) transcripts of depositions together with exhibits used in connection therewith, and answers to written interrogatories, and (c) supplementary documentary items, including all past and present passenger service contracts between defendant railroads and the State, as were submitted with the motions.
The questions presented for resolution here may best be placed in focus by referring to the allegations advanced by the two groups of plaintiffs in their complaints and in the pretrial order. Plaintiffs City of Bayonne and Bonner contend that the Central Railroad Company of New Jersey (hereinafter Central) furnishes rail passenger transportation service to and through the City of Bayonne and has done so for many years. That passengers have become dependent upon such service for transportation between Bayonne and New York City, and that the welfare and economy of the City of Bayonne are accordingly dependent upon the availability of such rail service. They contend that by virtue of the contract which is purported to be dated June 29, 1964, between the State (by the State Highway Commissioner) and the Central, such rail service to Bayonne will terminate, in that the Central, acting under the authorization of the State Highway Commissioner, will abandon certain of its rail facilities and discontinue rail passenger service at a point midway between the northerly and southerly boundaries of Bayonne and thereby effectively remove rail passenger service between Bayonne and New York City. These plaintiffs, who it is contended would thereby be adversely affected, further contend that for various reasons said contract is invalid, that the parties acted without lawful authority, that the legislation bearing upon the subject is unconstitutional, and that the *252 entire program of state subsidies to private railroads is unconstitutional. With respect to the claim of unconstitutionality, these plaintiffs specifically contend that the underlying statute, L. 1960, c. 66, as amended and supplemented, is unconstitutional in that it authorizes state subsidies to private railroads; that it is a private and special law and contains inadequate standards to control the legislative agent in the exercise of the delegated powers. For the same reasons plaintiffs further contend that L. 1964, c. 88, purporting to authorize subsidies to private railroads is also unconstitutional.
These plaintiffs further contend that the contract in question, purported to be dated June 29, 1964, was, in fact, entered into after the repeal by the Legislature of L. 1960, c. 66, because the contract was not validly executed and delivered prior to the effective date of said repealer; further, that it was executed without corporate approval. They further contend with respect to the contract, that it lacks the support of the legislation upon which it purports to rest and is illusory in that it is conditioned upon service agreements which the Central may choose not to make or which may be nullified by federal agencies.
Plaintiffs Township of Hillside, Tittel and Kleiman contend that the Lehigh Valley Railroad Company (hereinafter Lehigh) has operated a line through Hillside for many years, the operation being confined to the carriage of freight. The Lehigh rail line bisects the township and provides but three crossings. At the northern end it underpasses North Broad Street and at the southern end it overpasses Conant Street. About halfway between, it crosses Long Avenue at grade. Further, that the Central has operated a passenger and freight railway line between Bayonne and Hampton through Cranford, Roselle Park and Elizabeth for a great many years. They contend that in or about July 1964 the State, through the Highway Commissioner, entered into written contracts with the railroads to effect what is known as the Aldene Plan. This plan broadly contemplates the discontinuance of practically all passenger services on the Central between a point *253 east of Cranford called Aldene and Bayonne, and the diversion of said passenger service at Aldene over the Lehigh line to a point called Hunter and thence over the Pennsylvania line to Pennsylvania station at Newark. They contend that the Aldene Plan includes, among other things, the dead-ending of Long Avenue in Hillside which would create a hazardous condition in that it would effectively interfere with police and fire protection and would cause a heavy traffic load on the already overburdened crossings at the ends of the township. Further, that such dead-ending would create a hazard in that pedestrians, especially children, would be tempted to cross the railroad tracks in prohibited areas. They also contend that the dead-ending would contribute to a great depreciation of property values in the vicinity of the Lehigh railroad right of way.
In their allegations as to the unconstitutionality of the supporting legislation, these plaintiffs join in the arguments raised by the plaintiffs in the Bayonne action.

I.
Before adverting to the arguments advanced by the defendants, reference, through a brief analysis, should be made to the legislation which has brought about the questions presented here.

A.
L. 1959, c. 14, N.J.S.A. 27:24-1 et seq. This statute creates the Division of Railroad Transportation in the State Highway Department under the immediate supervision of a director who is answerable to the State Highway Commissioner. Section 1 sets forth the legislative findings that many railroads are seeking to curtail commuter and passenger service; that railroad transportation is the most efficient means for the movement of people especially during rush hours; that adequate commuter and passenger railroad service is essential to the welfare of the State, and that the State should lend its assistance to the solution of these problems.
*254 The duties of the Division are set out in section 5, which calls for the examination and study of existing facilities and arrangements and accords by the railroad operators so that commuter and passenger services may be improved. The Division is to give assistance to the operators in developing plans for additional facilities as well as any activity which will tend to improve service. Finally, the Division is to engage in continuous study of commuter and passenger railroad operations to seek solutions to the various problems including the need for services, the need for extension of existing services, deficit operations and the railroad tax situation. This act was to expire on January 1, 1962.
L. 1960, c. 66. This was the first major legislation aimed at meeting the problems of railroad commuter and passenger service. Section 1 of the act set forth the legislative findings and policy which included the following: that use of commuter and suburban passenger rail service has been declining; that this decline has been caused by increased use of other methods of transportation; that the result has been a curtailment of service by the railroads; that a continuation of such trends can lead only to substantial highway congestion which will require expenditure of many millions of dollars for additional road facilities; that economic values will be adversely affected throughout the State, and that it is essential to the public health, safety and welfare and industrial potential of the State that such commuter and passenger rail service be preserved and increased, if possible, at least until it is determined whether more efficient and desirable alternative means of transportation can be economically provided. It was further determined that it would be in the best interest that railroad facilities for necessary commuter and suburban rail passenger service be preserved by the payment of certain subsidies to contracting railroads of compensation not exceeding the value to the State of the consideration it received for the service. Section 2 consists of definitions. Section 3 sets forth bases upon which the Commissioner shall determine what passenger service is essential to the public interest for the coming year. *255 In making his determination he was required to consider, among others, the following factors: (1) the State's need of time and money to develop an orderly program of substitutes for passenger service in danger of discontinuance; (2) the likelihood of curtailment of passenger service in the area affected by the contract and alternative means of transportation; (3) comparisons of those contributions made by the State toward the cost of transportation of passengers by rail under the act or by vehicles operated on highways, bridges or tunnels; (4) the effect on other transportation facilities of further curtailment of passenger service; (5) the current trends of population in the State and the economic loss to the State if passenger service is not preserved or expanded as needed; (6) the danger to the public health, safety and welfare of adding more vehicles to highways, bridges and tunnels and (7) the effect on tax revenues and economic values in any area of continued highway, bridge and tunnel construction. In aid of such investigation, the Commissioner was required to hold hearings and conferences where interested parties could be heard.
Section 4 provides the technical contract requirements and sets forth the following: each contract shall limit the amounts to be paid by the State to a sum not exceeding the amount of the appropriation for the fiscal year made pursuant to this act and shall contain provisions for the ratable reduction or limitation of amounts payable by the State; no contract shall provide for payments in excess of the maximum rate determined with respect to a fiscal year; every contract shall describe the service required to be operated, together with the plan for operation, including timetables, train consists and fare tariffs, and specific rates to be collected for all passenger service.
Section 5 obligates the carrier to operate a schedule of passenger service as described in the contract, at rates included in the contract; to abide by all requirements by any state or federal agency or court necessary to fulfill its obligations; not to initiate, take or prosecute, and to resist actively *256 any proceedings before any agency or court that will impair the operation of the contracted service or authorize the discontinuance of any service or the increase of any rate during the contract term, and to maintain passenger service in a safe, adequate and proper manner.
Under section 6, the State is obligated to pay a specified rate for each car mile of contracted service. Section 7 provides for technical provisions of the contract concerning determination of car miles, deduction of penalties, auditing of accounts, waivers, releases and other matters of public interest. Section 8 provides for amendment of the contract, and Section 9 provides the mechanism for establishing rates charged the users of all passenger service.
Section 10 obligates the carrier to continue all its passenger service, approved or unapproved, during the term of the contract, except that after six months the Commissioner may re-evaluate the unapproved service to determine whether the same be reasonably required during the remainder of the contract. He is required to study and make a determination, and shall hold a hearing and take into consideration such factors as may be brought out at the hearing and those other factors contained in section 3 above. Any action taken pursuant to such a determination shall be for the duration of the contract only, unless extended by future contracts or determinations. Any carrier which does not enter into a contract under this statute is required to provide passenger service in accordance with law.
Section 11 suspends all statutes, regulations or order of any state or federal agency, or any court, made prior to or during the period of the contract, and states that compliance with the contract constitutes compliance with all laws relating to the subject matter of the contract.
Section 12 empowers the Commissioner to make rules and regulations, conduct investigations, and spend money received from any federal or state agency in addition to that appropriated by the Legislature.
*257 Section 13 makes all evidence, material and documents received by the Commissioner in the process of performing his duties under the statute not evidential in any proceeding and neither the Commissioner nor his employees shall be required to testify with regard to such information at any time.
Section 14 provides that the statute is intended to protect and promote the public health, safety and welfare, and shall be liberally construed. Section 15 relates to severability.
L. 1962, c. 1. This statute amends L. 1960, c. 66 merely by inserting as an additional area of regulation that of ferry service, and the appropriate sections are amended to include that. There are no other substantial amendments.
L. 1962, c. 191. This statute is supplementary to L. 1960, c. 66. In section 1, the Legislature determines that it is necessary to authorize the Division of Railroad Transportation to undertake improvements to capital facilities set forth in the prior statute; to protect the State's investment in the master plan for highway construction; to coordinate with interstate transportation improvements and achieve greater efficiency in rail passenger service. Section 2 authorizes the Commissioner to undertake improvements to capital facilities to provide connecting passenger service between the Central PATH by rerouting the Central passenger trains to operate between Pennsylvania Railroad Station in Newark and terminal stations on the Central right of way by utilizing the Lehigh tracks and the Pennsylvania system east of Cranford Junction; to consolidate the passenger service now operated between the Central and Pennsylvania over the right of way of the New York and Long Branch Railroad by eliminating the service operated from Bay Head Junction by the Central and supplementing that operated by the Pennsylvania and rerouting all passenger trains over the Pennsylvania right of way to Newark or New York, providing that the public's share of the cost of these improvements does not exceed $3,000,000.
Section 3 relates to the conditions to be specified in the contract; that the carrier take immediate action to commence *258 the required improvements; that the State make the required payments subject to the conditions that the work on the improvements has been done in accordance with the contract, and that the carrier enter into a contract to provide approved passenger service under L. 1960, c. 66.
Section 4 is a section of definitions, and section 5 appropriates the sum of $3,000,000 for carrying out the provisions of the act.
L. 1962, c. 198. This is a general though partial revision of Title 48 concerning public utilities. A great portion of this statute is not applicable in any way to railroads, and of those sections applicable to railroads, few created any appreciable change in the then existing law. The major changes which might be thought to affect the present railroad situation relate to the areas of eminent domain and discontinuance.
With respect to the former, section 48, N.J.S.A. 48:3-17.6, permits a public utility to take such property or interest which may be reasonably necessary for the purposes of such utility. Section 49, N.J.S.A. 48:3-17.7, provides, among other things, that the utility must obtain the approval of the Board of Public Utility Commissioners (Board) in order to exercise condemnation, except where a governmental agency having jurisdiction has granted the utility the permission to take all acquired property or any interests for the utility's purposes. (According to a legislative memorandum submitted by Deputy Attorney General William Gural, the revision with respect to condemnation centralizes matters and renders uniform the procedure to be followed by specified utilities endowed with eminent domain powers.)
With respect to discontinuance of service, there was no advance approval required under R.S. 48:2-24 until the enactment of L. 1959, c. 55, which required a railroad maintaining passenger service to obtain permission from the Board after notice and hearing before they would be permitted to discontinue, curtail or abandon service. Section 16 of chapter 198 merely extends the requirements of prior permission to all public utilities rather than just railroads. All amendments *259 to R.S. 48:12-1 et seq., "Railroads," are primarily technical in nature relating to bridges, tunnels, construction and maintenance of railroads, grade crossings, safety measures and the like.
L. 1964, c. 58. This statute amends and supplements N.J.S.A. 48:2-24. The statute originally provided that discontinuance, curtailment and abandonment by a public utility required Board permission, and that the Board might deny the permission if the proposed action would adversely affect public convenience and necessity. Section 1 of the statute provided that the Highway Commissioner would have the power without the approval of the Board to authorize a discontinuance, a curtailment or abandonment or change in passenger service, to extend during the term of a contract entered into by the Highway Commissioner and a railroad for passenger service pursuant to L. 1960, c. 66. Section 2 ratified and confirmed any discontinuance, curtailment or abandonment previously approved by the Highway Commissioner without the approval of the Board.
L. 1964, c. 88. This statute repealed L. 1960, c. 66 and substituted in its place a new law concerning passenger railroad and ferry service.
Section 1 repeats in some measure the legislative findings of the prior statute and finds, in addition, that railroad and ferry carriers are operating passenger service at a financial loss; that a continuation of these losses will lead to attempts at discontinuance of vital rail passenger and ferry service as well as increased fares, and that contracts should be made by the State to provide for necessary commuter and suburban rail passenger and ferry service.
Section 3 requires an annual investigation by the Commissioner of rail and ferry service showing the financial results of such service, together with a determination for action to be taken to offset the losses shown. The Commissioner may recommend changes in service, fares, procedures and routings, improvements to capital facilities and compensation by the State for the service to be rendered under a contract. *260 The determination shall list the service to be operated, fares to be collected, and projects to carry out the objectives of the act. The Commissioner is required to hold hearings and meetings to make known his recommendations and to receive material and recommendations from others.
Section 4 provides for the contracting power to be reposed in the Commissioner and is the same as under the prior act, with the exception that provisions for capital improvements shall be described.
Section 5 is, in most respects, the same as under the prior statute, except that it provides for the initiation and completion within the stated time of all capital improvements required under the statute.
Sections 6, 7 and 8 are also exactly or substantially the same as the prior statute.
Section 9 replaces section 10 of the prior statute relating to obligations to provide for passenger service. The carrier is required to continue all passenger service during the term of the contract but shall have the right to petition the Commissioner for changes during such term. If the petition requests a decrease or change in schedules or increase in fares, a public hearing on notice must be held. Based on information and evidence obtained at the hearing or on any other information available as the result of investigation or study, and with consideration of the factors listed in section 3, the Commissioner shall make a determination as to whether such change shall be made effective. Any such change shall be for the duration of the contract only, unless extended by future contracts. Sections 10, 11, 12, 13 and 14 correspond to sections 11, 12, 13, 14 and 15 of the prior statute and are exactly the same.
Section 16 repeals L. 1960, c. 66, and further states that the repealer does not in any way affect any contracts, agreements, determinations, orders, rules or regulations of the Commissioner, but such of the above shall continue with full force and effect until otherwise amended, repealed or terminated pursuant to this statute.
*261 L. 1964, c. 89, N.J.S.A. 48:12A-21. This act supplements L. 1962, c. 1 relating to the improvement of capital facilities. It empowers the Division of Railroad Transportation to undertake directly or by contract the entire expense of eliminating or relocating such highway or railroad crossings at grade as shall be necessary or desirable to carry out the purposes of L. 1962, c. 191. The Commissioner may expend such funds as have been appropriated in the past or will be appropriated in the future. The act further appropriates from the sum previously appropriated to the State Highway Department in its capital construction account for grade crossing elimination, notwithstanding any existing allocation of such sums, so much as shall be required to carry out the provisions of this act.

B.
The objectives of the pertinent legislation which have been briefly described hereinabove, are graphically set forth therein. Throughout there are consistent legislative findings that adequate commuter and passenger railroad service is essential to the welfare of the people of the State and constitutes, on a comparative basis, the most efficient means for the movement of people during rush hours (L. 1959, c. 14, § 1). These legislative determinations and findings are buttressed by particular studies. In April 1960 the Division of Railroad Transportation in the New Jersey Highway Department, in a report to the Governor and the Legislature[1], found that suburban railroads are an essential part of the State's transportation network and that it is in the public interest, in terms of convenience, economy and safety, to continue and improve rail passenger service. It was noted therein that New Jersey highways had reached the point of "over-saturation" and that suburban train service was being curtailed, thereby increasing commuter use of highways. The history and causes *262 of increased highway congestion and its correlation to passenger patterns was chronicled. Commuter trends in the northern metropolitan areas were studied and detailed in depth. Substantial deficits incurred in passenger railroad service were documented. Further, it was noted that:
"* * * In New Jersey dependence on the rails for passenger service is primarily commutation  `rush hour service.' The railroads are providing a service that sustains a way of life to which more than 100,000 of our citizens and their immediate dependents are committed and on whom many thousands more are indirectly dependent. The consequences to our economy would be serious and should be of concern to all  commuters and non-commuters alike  should these citizens find it necessary to move out of our State, or even should the State find it necessary to attempt to accommodate them on the highways during peak periods  which it obviously could not do. Economic studies recount that our rail commuters generate a buying power of over $3 billion a year, much of which would be lost if any substantial number of commuters and their families were obliged to move to another State.
Without public interest suburban service in New Jersey will undoubtedly further deteriorate[2]  may even as some prophesy  wholly disappear."
Similar findings were made in a second report of the Division of Railroad Transportation.[3]
In January 1964 the Highway Commissioner rendered a certification to the State Treasurer of New Jersey pursuant to L. 1961, c. 32, the Emergency Transportation Tax Act, N.J.S. 54:8A-1 et seq., wherein it was noted that "the movement of people and property between the states of New York and New Jersey has been an increasingly difficult problem for many decades"; that during several years "the rail commuter situation continued to worsen," and that many commuter lines threatened curtailment, reduction or discontinuance of passenger service. Legislative action permitting the Highway Commissioner to negotiate service contracts with rail carriers "to assure continuance of essential passenger *263 service" and to use monies from highway funds to accomplish these purposes was noted. It was further noted, on the basis of statistical analysis, that there was a drastic shift to interstate highway travel away from "deteriorating rail passenger facilities and an ever rising use of public highways." The Commissioner noted that "if this trend is not arrested the effect will be destructive." Further, "as the shift from rail transit to automobile travel has been most significantly manifested on the interstate level, correction of the trend at this level by restoration of interstate travelers to public carriers will have important beneficial effects in improvement of public carriers services within the states and in a general lessening of the costly trend toward private automobile travel upon congested highways."
On September 25, 1965 the Highway Commissioner filed his determination for the fiscal year 1964-65 concerning the financial results of utilities providing passenger services.[4] This document details the financial impact of the state program of financial assistance to utilities furnishing necessary and vital passenger services, and encompasses an historical review of the program, together with recommendations for future action. As stated therein:
"* * * the program seeks to maximize attainment of the most important and settled goals; the need to `buy time' to reach long range solutions by keeping each important passenger carrier functioning in reasonable volume, the avoidance of curtailments of service particularly where discontinuances would otherwise be most imminent; the relative long term and short term financial status of the carriers as it indicates the probability of their staying in business; the preservation of services benefitting the greatest number of persons; the effect on fares; the significance of the service in terms of the availability of alternate means of transportation; the impact of discontinuance on public expenditures for highway safety and construction; the population and economic growth trends, and the impact on economic values. *264 These are among the principal guideposts established in legislative deliberations over the recent years, running back to the so-called `turnpike surplus' referendum of 1959 and before, the Division of Railroad Transportation legislation of 1959, the contract law of 1960, the supplementing statutes and appropriations and now the 1964 legislation. One must bring these to bear in determining the amounts which should be offered to achieve the objective with each carrier, and comparing this against the reciprocal demands which have been or will be made by each carrier as the basis of agreement."[5]

C.
Reference must also be made to two additional matters before we may reach a resolution of the legal questions presented here. These matters are the Aldene Plan contracts and the contracts for annual service.
The basic Aldene agreement is that between the State and the Central dated June 29, 1964. In its recitals it purports to be in implementation of L. 1962, c. 191, the basic Aldene legislation. After defining two terms in paragraph 1, the agreement under paragraph 2, sets up the obligations of the Central to construct a connection with the Lehigh tracks at Aldene, to provide storage and service facilities for passenger trains at Raritan and at a point east of Newark, and to do such other things as may be approved by the Commissioner as being essential to the operation of a safe and dependable passenger service. The paragraph then provides that the railroad is to do none of this work until it has made all agreements with other railroads "as may be necessary for the railroad to perform the passenger carrying service required by this agreement." Paragraph 2 finally provides that the Commissioner is to be the coordinator of all the work in question, is to control expenditures, and is to approve all work in advance on the basis of detailed monthly schedules. In paragraph 3, the Commissioner agrees on behalf of the State to arrange for the grade crossing eliminations and other related work on the Lehigh line on a schedule compatible with the Central's work.
*265 In paragraph 4, the railroad (Central) agrees that, following the completion of the improvements:
"* * * It will operate or cause to be operated the following passenger carrying services for a period of not less than five years from their inauguration:
(a) Between its terminals at Hampton, Raritan and Plainfield, New Jersey and the Pennsylvania Station in Newark, New Jersey, over its own tracks to Aldene, the Lehigh Valley Railroad to Hunter and the Pennsylvania Railroad to Newark.
(b) Between its Cranford and Eighth Street and Thirty-third Street, Bayonne stations over its own tracks."
During the first year of operation the service into Newark is to include at least 28 trains on weekdays and the Bayonne service is to include at least 27 trains on weekdays. Paragraph four also requires the Central to maintain its shore service, or arrange with the Pennsylvania to do so, "for a period of at least five years beginning not later than the inauguration of the [main line] service." Again, the first year obligation is spelled out in terms of numbers of trains, and the paragraph concludes with an agreement that further details shall be determined under the annual service contracts.
In paragraph 5 the State agrees to reimburse the railroad for the cost of the improvements in accordance with certain standards. In paragraph 6, the railroad agrees that the passenger carrying service shall be provided under annual service contracts to be negotiated for the five years, and agrees that deficit determinations shall be made under existing formulas. The Commissioner agrees that the Central's portion of future contract payments will not be less than its portion of future deficits for services provided under the contracts, and that the Commissioner will make every reasonable effort to secure funds sufficient to cover an increasing proportion of the deficits involved in furnishing the contracted service.
In paragraph 7, the railroad agrees to cooperate in making the improvements and to operate the passenger carrying service required by the agreement in a manner which will provide all reasonable safety, comfort, convenience and economy *266 to the citizens of New Jersey. In paragraph 8, the railroad agrees to arrange with its lessees and licensees for necessary relocation of facilities. Paragraph 9 recites the intended scope of the contract, which "is the completion of certain improvements to railroad capital facilities to enable the railroad to provide passenger carrying service, all as specified herein."
The companion agreement between the Commissioner and the Lehigh, dated the same date as the Central agreement, has not been particularly assailed in this proceeding. Briefly, under it the Lehigh agrees to permit enumerated grade crossing eliminations and other changes to be made on its lines to accommodate the Central's passenger trains, to undertake diligently to reach agreements with the Central to permit the Central's passenger trains to use the Lehigh tracks for as long as the Central's contracts may require (which agreements have to be approved by the Commissioner prior to August 1, 1964 under paragraph 2 of the Central contract), and to adjust its freight movements to accommodate the Central passenger service.
The so-called annual service contracts between the Central and the Pennsylvania over the past years have been substantially identical. For the purposes of this opinion, reference will be made to the agreement with the Pennsylvania for the 1964-65 year. After defining passenger carrying service in paragraph 1, paragraph 2 provides that the railroad, from the date of the agreement to midnight June 30, 1965, is obligated "to operate contracted service" as set forth in Exhibit A. Exhibit A, by reference to published timetables together with some specific listings, establishes the service to be provided. Paragraph 2 further provides that the railroads shall:
"* * * maintain and operate passenger service required by virtue of this contract, equipment and all facilities incidental thereto in a safe, sanitary and proper manner and condition with a minimum of delays or cancellations and insofar as possible maintain arrival and departure times for all stations."
*267 Paragraph 3, with the aid of Exhibit B, establishes the number of seats which the railroad must provide for each movement. The seven pages of Exhibit B break this down by terminal points, day of the week, direction, train number and number of cars of each seating capacity required. For example, between Rahway and New York (a distance in New Jersey of 19.6 miles) the Pennsylvania must operate, Monday to Friday, an eastbound train, identified and scheduled in the timetables as train No. 3904, with eight 72-seat cars (or the equivalent in seating capacity). A similar provision is found for each movement of contracted service. Paragraph 4 establishes the fares which the railroad may charge, by extensive reference to Interstate Commerce Commission and Public Utilities Commission tariffs, and commits the railroad to collect the fares.
In paragraph 5 the railroad agrees: (a) until August 31, 1965, not to initiate any action in any state or federal agency or court which could impair or limit "the rights, powers or capacity of the railroad to operate the contracted service," and to "actively resist" such proceedings initiated by others, if so requested by the Commissioner (b) upon request, to prosecute whatever proceedings are necessary to enable it to fulfill its contract obligations; (c) to abide by reasonable regulations of the Commissioner pertaining to the service, and (d) "Upon the written request of the Commissioner waive any rights or remedies that it may lawfully waive, insofar as the exercise of such rights or the pursuit of such remedies would be inconsistent with the fulfillment of the obligations of the railroad incurred by virtue of this agreement."
Paragraph 6 recites the finding of a net railway operating deficit from New Jersey passenger-carrying service of $7,678,000 in 1963, as computed in accordance with Interstate Commerce Commission prescribed accounting practices. And further, as shown in Exhibit D, it reflects the estimate of the parties that the deficit figure for 1964 will be of similar proportions, and pledges the State to a payment of $1,799,000 *268 to the railroad to purchase the contracted service in 1964-65. Paragraph 7 requires the railroad to furnish full financial operating data for 1964 by May 1, 1965. Paragraph 8 provides for the Commissioner to determine whether the service has been "satisfactorily furnished" as to each train. Arrival of a train at its terminal more than four minutes late makes it "unsatisfactory." Equipment shortage has the same effect. For every day of "unsatisfactory" service in excess of 25% of the days of operation in question, a deduction is made in the amount of 28¢ times the number of cars involved, times the number of minutes of the run. Paragraph 9 provides that where there is a "voluntary" failure to run a train contracted for, the railroad shall forfeit ten times that deduction, i.e., $2.80 per car mile. And where the railroad violates any other aspect of the contract  as, for instance, by not cooperating in getting administration approvals and the like  the Commissioner may make deductions from the contract payments according to his estimate of the harm resulting to the public interest and the inconvenience and expense to the Highway Department.
Paragraph 10 recites that payment by the State will fulfill its obligations. Paragraph 11 disclaims any intention to cover "health, safety, welfare, rights and objections of passengers, employees" and others, leaving those subjects to other authorities as theretofore. Paragraph 12 excuses nonperformance due to court or agency order. Paragraph 13 notes that four discontinuances and two changes previously approved are to continue in effect. Paragraph 14 recites an agreement on the effective date of the contract. Paragraph 15 modifies Exhibit A in one particular. Paragraph 16 provides for adjustment of schedules to accommodate joint service arrangements with PATH. Paragraph 17 obligates the railroad to submit a proposal for an interchange arrangement with the Susquehanna, giving capital costs and rent requirements.
Finally, paragraph 18 commits the railroad to aid in completing the Aldene Plan changes and to cooperate in developing schedule adjustments required as a result of it.

*269 II.
Having set forth, albeit rather broadly, the essentials of the legislative and contractual arrangements which have been established between the State through the Highway Commissioner and defendant railroads, I turn now to a discussion of the legal issues which have been raised by the plaintiffs in their attack upon the whole structure of the railroad subsidization program.

A.
The plaintiffs contend, first, that the entire program of state subsidies to private railroad corporations, including the Aldene Plan, violates the New Jersey Constitution, specifically Art. VIII, Sec. III, Par. 3.[6] The argument advanced has its foundation, plaintiffs claim, in the historical background of the constitutional provision in question and the observations of our judges made in various opinions which have been handed down from time to time since the adoption of the original constitutional provision in 1875.
Plaintiffs point out that the New Jersey Constitution of 1776 contained no prohibition against a loan of the State's credit, nor any prohibition against the donation of land or the appropriation of money by the State or any municipal corporation to or for the use of any society, association or corporation. During the early part of the 19th Century, in New Jersey as in other states, there existed a great need for a supply of currency and credit for the development of various *270 enterprises, most particularly canals and railroads, which were then rapidly expanding with the growth of our economy Private capital for large-scale investments was not plentiful, due to the fact that this nation during that period was largely agricultural. From time to time the Federal Government came to the aid of private business enterprises by yielding grants of land and making loans of money and credit. When the clamor arose that too great concentration of authority was being gathered in the Federal Government, federal subsidies were curtailed and the problem was left largely to the states, which were often without sufficient finances to meet the ordinary expenses of government, much less to aid in the much needed improvements required, particularly in the means of transportation. The states were in the position where they had either to furnish aid to private enterprise and thus develop transportation facilities, or else organize such facilities themselves. During the period from 1816 to 1846 there was extensive and highly speculative subsidization by the states, which proved costly and in many instances imperiled the solvency of the states. In some instances what had been done turned out to be a reckless use of public funds. When it became apparent that the means adopted to encourage the growth of transportation facilities constituted a danger to the fiscal soundness of state governments, a trend developed among the legislatures of the various states to incorporate in state constitutions prohibitions which would prevent the use of state funds for private enterprise.
In New Jersey the first indication of the recognition of public concern for the rather improvident participation by state governments in private transportation corporations was evidenced by the inclusion by the delegates of the New Jersey Constitutional Convention of 1844 in the Constitution of that year of a clause (Art. IV, Sec. VI, Par. 3) providing that "the credit of the state shall not be directly or indirectly loaned in any case."
Although the provision so adopted barred the support of private enterprises by the use of the State's credit, there was *271 nothing contained in the 1844 Constitution which explicitly prevented donations or appropriations of public funds or lands in support of private ventures. Nor was there anything in the 1844 Constitution which prohibited counties and municipalities from engaging in the practice prohibited to the State. The development of railroads as a means of transportation continued. The possibility of having fast transportation at low cost, coupled with the belief that railroads could not compete successfully with canal companies, led the State to lend its aid in the manner indicated to the further development of the railroads. The railroads thus became the recipients of the greatest benefits from loans and gifts of state money and credit. Plaintiffs contend that in a sense railroads have always been looked upon as public highways. Although the railroads cannot be deemed a branch or agency of the State or of public corporations, they point out that the construction of a railroad has nonetheless been considered to be in the public interest. Accordingly, the states continued to aid in the construction of railroads by the donations of funds, subscription to capital stock or an issue of bonds. The growing opposition to the states' policy of subsidizing railroads, notwithstanding the public nature of the services rendered, led to the 1875 amendments to the 1844 Constitution. Paragraph 19 of Article I was added in 1875 so as to deny to local governments power to give any money or property, or to loan their money or credit to or in aid of any individual association or corporation, and paragraph 20 of Article I was added which read:
"No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever."
The counterpart in the 1947 Constitution of the prohibition contained in the 1844 Constitution against the use of state credit is in Art. VIII, Sec. II, par. 1, and the counterparts of the 1875 amendments are found in Art. VIII, Sec. *272 III, par. 3. No change was made in the language by the 1947 Constitution.[7]
The historical summary which I have set forth, drawn largely from plaintiffs' arguments, may be found summarized in several decisions of our courts over the past years. See e.g., Carr v. Borough of Merchantville, 102 N.J.L. 553, 556 (Sup. Ct. 1926); Behnke v. New Jersey Highway Authority, 25 N.J. Super. 149, 159 (Ch. Div. 1953), affirmed 13 N.J. 14 (1953). For out-of-state references to this question, see: Washington State Highway Commission v. Pacific Northwest Bell Telephone Company, 59 Wash.2d 216, 367 P.2d 605 (Sup. Ct. 1961); Johns Hopkins University v. Williams, 199 Md. 382, 86 A.2d 892 (Ct. App. 1952); City of Cincinnati v. Harth, 101 Ohio St. 344, 128 N.E. 263, 13 A.L.R. 308 (Sup. Ct. 1920).
Plaintiffs argue that they have set forth and depend, to some extent, on the historical basis of the constitutional prohibitions, because if the intent of the people in imposing the particular restraint is to be sought and honored in applying a clause of our State Constitution, the recitation of the historical basis demonstrates beyond question that what the framers of the 1875 amendments intended to prevent is precisely what our Legislature is now attempting to accomplish. They argue that while legislative enactments are presumptively valid, it is equally true that the Legislature cannot declare public policy that is so clearly contrary to the letter and content of the State Constitution, which, unlike the Federal Constitution, is not a grant but a limitation of legislative power. A declaration of policy by the Legislature is necessarily restricted, plaintiffs argue, by the limitations of our Constitution. See Behnke v. New Jersey Highway Authority, supra; Fischer v. Twp. of Bedminster, 5 N.J. 534, *273 542 (1950). They observe that although a statute passed in accordance with law may declare the public policy, a statute cannot declare the public policy contrary to the State Constitution.
Plaintiffs place some reliance upon the observations, mostly dicta, made by the courts in cases such as Hill v. City of Summit, 64 N.J. Super. 522, 531 (Law. Div. 1960), and Roe v. Kervick, 42 N.J. 191, 206 (1964), to the effect that the constitutional provision was inserted to prohibit governmental grants to railroads. Plaintiffs' principal reliance, however, is on Wilentz v. Hendrickson, 133 N.J. Eq. 447 (Ch. 1943), affirmed 135 N.J. Eq. 244 (1944). This case, which plaintiffs characterize as the leading authority in New Jersey on the matter of grants to railroads since the adoption of the 1875 amendments to the Constitution of 1844, involved the forgiveness of certain accumulated tax delinquencies by the State to railroads. Plaintiffs point out that the similarity between the situation which confronted the railroads at the time of that decision and that existing at present is striking. In 1941 the Legislature found and declared that the dire financial straits of the railroads cast doubt upon their ability "to continue to furnish adequate and safe service"; that New Jersey was "peculiarly dependent upon efficient transportation," and payments by the railroads of accumulated tax delinquencies would "impair the capacity of the delinquent railroads to furnish such transportation service." L. 1941, c. 290.
In Wilentz v. Hendrickson, Vice-Chancellor Jayne held unconstitutional the cancellation of a fixed financial obligation due and owing to the State from private railroad corporations. The statutory scheme was found to constitute a gift of public funds or property, and the mere general financial plight of the railroads, without more, was not regarded as "consideration." The court emphasized that the cancellation of the obligation in question constituted an impermissible gift, because it was not supported by some legal, equitable or even a moral consideration.
*274 In Trustees of Rutgers College in New Jersey v. Richman, 41 N.J. Super. 259, 295, 298 (Ch. Div. 1956), Justice (then Judge) Schettino stated:
"Donations of land and appropriations of money by the State have been sustained in cases in which (1) the recipient is a public instrumentality, or (2) the recipient has furnished or agreed to furnish a substantial quid pro quo to the State. * * *
Public appropriations which are founded upon some legal, equitable or moral consideration to the State are not prohibited by this constitutional provision. The accomplishment of an important public object or a moral duty to the citizens of the State is sufficient to sustain the validity of the appropriations * * *. It is not essential that the consideration meet the test of adequate consideration in the strict contract sense."
The principles to be considered when reviewing the validity of a statutory plan which is claimed to be violative of the constitutional provision in question were carefully and fully set forth by Justice Francis in Roe v. Kervick, 42 N.J. 191 (1964), and more recently succinctly restated in broad form by Chief Justice Weintraub in Whelan v. New Jersey Power and Light Co., 45 N.J. 237 (1965). Roe v. Kervick involved the validity of L. 1962, c. 204 (N.J.S.A. 13:1B-15.13 to 15.22), which was designed to assist with projects in redevelopment areas. The court held that the plan which involved state aid in the acquisition and development of land, or the construction or rehabilitation of buildings, or the purchase of machinery and equipment in connection with an industrial enterprise in an area of the State where there is determined to be unemployment of a given duration or quantity, did not violate the constitutional provision here in question, even where such rehabilitation was conducted through an agency which might be a private individual, corporation or other management form. The court held explicitly that the program of governmental assistance designed to relieve chronic unemployment could be accomplished through the use of private agencies. The principles established by the court in Roe v. Kervick in upholding the legislation in question are *275 that the purpose of the program must be public and the means must be proper. As to the means, the Court stated:
"* * * Is the transaction, involving the transfer of public money, contractual in nature, and if so, is it based upon a substantial consideration from the recipient of the money apart from simply an obligation to repay the money with interest, which consideration is intimately associated and burdened with execution of the public purpose of the statute? Is the agreement of the recipient of the financial assistance to accomplish the public purpose of the statute, i.e., relief of unemployment, the paramount factor in the contract, and is any private advantage incidental and subordinate? If answers to these questions are in the affirmative, then the financial assistance contracted to be given by the Authority and the county or municipality is in return for an undertaking to bring about the public purpose within the framework and the safeguards of the statute. Such a transaction does not constitute a forbidden loan within the contemplation of Article VIII of the Constitution. It is a valid compact based upon an exchange of substantial considerations." (42 N.J., at p. 218)
The quoted principles represent the empirical considerations to be given when the problem of state participation through appropriation or donation to a private instrumentality is questioned. Technically, I suppose they are particularly apropos to a loan of money or credit by the State or one of its political subdivisions to a private instrumentality. I do not believe, however, that they must be regarded as inflexible or as an absolute verity when we consider programs other than those similar to those contained in statutes such as the Redevelopment Assistance Act. This observation is made in view of the language of Justice Francis, also found in Roe v. Kervick:
"An elementary object of government is to protect and further the health, safety and general welfare of the people. All of its myriad activities have that end in view. Whenever a condition of affairs appears in the state which presents a substantial threat to the accomplishment of that object, a governmental duty arises to apply within constitutional limits whatever measures are necessary and appropriate to check it." (Ibid., at p. 212)
Turning to the particular object involved in the legislation in question in Roe v. Kervick, Justice Francis observed
*276 "Relief of the poor has been considered an obligation of government since the organization of our State. Such relief has been regarded as a direct charge on the body politic for its own preservation and protection, standing very much in the same position as the preservation of law and order. Expenditure of money for that purpose by the State or a subdivision of local government pursuant to legislative authority is looked upon as the performance of a governmental function. [Citations omitted] No one suggests use of public funds to sustain the impoverished constitutes a donation or gift transgressive of Article VIII of the Constitution. Before statehood was achieved, the Legislature of the Colony adopted measures for relief of the poor. See Laws of New Jersey 1774, Paterson, p. 26 et seq. (1800). It may be noted that the statute which probably reflected the mores of the times authorized `if it shall be thought expedient' the imposition of a requirement that the relief recipient and his family wear `a large P * * * in an open and visible manner * * * upon the shoulder of the right sleeve of [his] upper garment.' It would be difficult to find a more striking example of changing social consciousness than the contrast between that statute and the Area Redevelopment Assistance Act under attack here." (Ibid., at pp. 212-213)
In Whelan v. New Jersey Power and Light Co., supra, the Chief Justice, referring broadly to the type of problem presented here, stated:
"These amendments were not intended to bar the State or its agencies from discharging their public duties through the medium of contracts with private entrepreneurs. No doubt the amendments of 1875 are hard-pressed today as government is called upon to subsidize privately owned operations which cannot exist unaided and which, if they fail, will leave a void which, under present day concepts of its obligation to the people government itself will have to fill. But the amendments must be applied according to their essence, understood in the light of the evil that led to their adoption. Hence, although they do prohibit the donation of public property and the lending of public credit where the sole public gain is at best but secondary to and derivative from the success of the entrepreneur who is aided, yet if government decides there is a need which it should meet in the interest of its citizens, the amendments do not deny government the power to meet those needs through contracts with private companies merely because the companies are attracted by the prospect of profit." (45 N.J., at pp. 246-247)
In Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), Mr. Justice McKenna, speaking for the majority of the Supreme Court of the United States, in *277 an opinion dealing with a clause of our Federal Constitution, observed:
"Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, `designed to approach immortality as nearly as human institutions can approach it.' The future is their care, and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality." (at p. 373, 30 S.Ct., at p. 551)
No doubt, when we view the amendments of 1875 as they have been incorporated in our present Constitution, they seem hard pressed by the ever-expanding activity of government in what might formerly have been regarded as an intrusion into private enterprise. Plaintiffs here have characterized the transportation programs under consideration as "creeping socialism." I submit, however, that the apparent pressure on this constitutional provision is highly illusory if we give regard to the hard facts of present economic and social life. The arguments of plaintiffs conceive the State to have existence independent of the people. In their eyes the State has embarked upon a program, calculated to drain the public purse for the aid of a private entrepreneur, and to devour, ultimately, an independent entity to assuage a hearty socialistic appetite. If we are to accept the major premise of the plaintiffs, i.e., an independent existence of the State, perhaps their argument can be accepted. The State is not, however, a great brooding monster detached and separate from the people. As Chief Justice Marshall said in McCulloch v. State of Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819):
*278 "The government of the Union, then * * * is, emphatically and truly a government of the people. In form, and substance, it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit." (at p. 404)
The same language is equally applicable to the governments of the several states.
What, in actuality, is sought to be accomplished by the legislation under attack here? The several reports of the legislative committees, the State Highway Commissioner and his study groups, all point to the massive transportation problem that exists in the northeastern and southwestern portions of our State. They point out the growing economic distress of the private companies which provide rail transportation service, especially in the northeastern quadrant of the State. They express alarm over the prospect of strangulation of the transportation system, most notably, the roads, highways and turnpikes in that section of the State, should the system of rail transportation be discontinued or materially impaired. The reports recognize the necessity for this mode of travel for the health, safety and welfare of the citizens. Faced with such a dilemma, it seems to me that the State has two alternatives: to acquire or construct a system of rail transportation in the sections of the State involved, or to employ the instrumentalities of the private carrier corporations to insure the continuance of this mode of travel. The State has chosen the latter alternative, indicatiing that in the judgment of the elected representatives of the people such a course would be more economic and productive for them. The purpose is obviously, therefore, a public one.
What are the means that are to be employed to solve the problem of transportation in the State by the use of the private instrumentalities? The answer has been given in the earlier part of this opinion which refers to the Aldene Plan providing for trackage interconnection and the annual service contracts. Plaintiffs argue that these contracts are illusory; that they do not involve a substantial consideration to the State, and that they enhance the economic wellbeing of the *279 private corporations involved. I conceive these arguments to be substantially without merit. Without belaboring the issue and attempting to examine into all of the provisions of the contracts in question, I point out the following significant features of these agreements which, in my judgment, adequately insure that the State shall receive the quid pro quo with which it seeks to insure the health, safety and welfare of the citizens.
First, in consideration of the funds to be advanced under a formula which provides protection to the public treasury through the supervision of the State Highway Commissioner, the contracting railroads each agree to provide certain rail service for the term of the contract and thus insure transportation to and from the affected areas. The transportation to be furnished is specifically set forth in schedules to the contracts, and failure to live up to the schedules both in quantity and in the nature of the service given, will visit penalties upon the railroads. In this area the judgment of the State Highway Commissioner is controlling. With respect to the funds which are to be expended to the railroads under the agreements, the formulae whtich have been devised and the statistics which are to be furnished to support the applications, are subject to the scrutiny, audition and review of the state representative, the Highway Commissioner. In short, the Commissioner exercises control over the entire relationship.
Second, to insure the continuance of the contracted service, the State has exacted from the railroad companies a covenant that none will apply to any federal agency having jurisdiction in the premises for the discontinuance of any of the rail service agreed to be supplied during the period of contract. By giving up their unquestioned rights to apply to the federal agencies for discontinuance relief, the railroad companies involved in interstate commerce, here the Central and the Pennsylvania, suffer a genuine detriment to the benefit of the people of this State. See 49 U.S.C.A. § 13a; State of New Jersey v. United States, 168 F. Supp. 324 *280 (D. Ct. N.J. 1958), affirmed Bergen County v. United States, 359 U.S. 27, 79 S.Ct. 607, 3 L.Ed.2d 625 (1959), rehearing denied 359 U.S. 950, 79 S.Ct. 722, 3 L.Ed.2d 683 (1959).
Consideration has always been deemed a key factor in cases involving alleged infringement of the alleged no-donation clause of our Constitution. Indeed in Roe v. Kervick, supra, Justice Francis referred to a substantial consideration from the recipient of money apart from simply an obligation to repay. 42 N.J., at p. 218. I have stated my conclusion that a real consideration flows here between the railroads and the State in the form of the benefit and detriment convenanted under the service contracts with respect to application for discontinuance of contracted service. Plaintiffs have regarded the consideration which I have referred to as being illusory. They cite Wilentz v. Hendrickson, supra, in support of their position.
In Wilentz, as has been noted, the Legislature had passed a law under which it agreed to accept less than it was entitled to receive from a group of railroad company taxpayers. In support of the legislation it was contended that the State received a consideration in the form of a forbearance on the part of the railroad companies to contest the underlying assessments. The court found as a fact that there was nothing to forbear. The court stated the action was taken without proof that the debt was not collectible. Accordingly, the statute was held to be unconstitutional.
Wilentz v. Hendrickson is only one of several cases in our jurisprudence involving a forfeiture or attempted divestment of vested money receivable by the State or one of its political subdivisions. In each of those cases the courts have held the giving up of the monies unquestionably receivable to be unconstitutional. None of the cases involved a service program. None of them involved a situation where a legislative body set out upon a well-considered program which was the result of exhaustive research and fact-finding, followed by a program to effectuate it. In New Jersey Bell Tel. Co. v. City of *281 Newark, 136 N.J. Eq. 479 (E. & A. 1945), the City of Newark acted under certain legislation to settle personal property tax obligations with the New Jersey Bell Telephone Company. The attempts were held to be invalid donations. In Murphy v. Town of West New York, 132 N.J.L. 111 (Sup. Ct. 1944), West New York agreed to take $75,000 in payment of an obligation of $121,261.52 due as taxes from the New York, Ontario and Western Railway Company, and this was likewise held invalid. In re Voorhees, 123 N.J. Eq. 142 (Prerog. 1938), the Legislature forgave a right vested in the State to receive an inheritance tax payment of $75,816.29 from the New Jersey College for Women, and the court held the statute forgiving the tax unconstitutional as effecting a donation of public funds. In Jersey City v. North Jersey St. Railway Company, 78 N.J.L. 72 (Sup. Ct. 1909), there was involved the release of a license fee obligation. This release was held to be a donation. In State v. Erie Railroad Company, 23 N.J. Misc. 203, 42 A.2d 759 (Sup. Ct. 1945) (not officially reported), involving the application of a payment on an indebtedness to principal first rather than to interest, again, the court found the device sought to be effected as a donation of public funds. All of these cases involved the State or one of its political subdivisions giving up funds which had accrued and which therefore were state property, without any consideration flowing to the State for the donation thus effected.
The key to the validity of the legislation here under consideration is the control given to the representative of the State, the Highway Commissioner, and the insurance of continued service during the period of a service contract under which an appropriation is given to the contracting carrier. In these areas it is fair to observe that the State seems to be better protected than it was under the legislative program reviewed and approved in Roe v. Kervick, supra. The question involved gathers difficulty because of the nature of the arguments which plaintiffs advance, dealing largely in economic *282 philosophy and, therefore, an appeal to the man rather than to the law. As Justice Francis said in Roe v. Kervick, supra:
"It is equally obvious that the Constitution does not guarantee a static condition of society, and that it does not incorporate the economic doctrine laissez-faire." (42 N.J., at p. 230)
The task of the judiciary in reviewing legislation such as that in question here is not for an imposition of the judge's personal philosophical or economic predilections upon the will of the Legislature. His duty is clearly to review the questions posed in the light of legal precedents, with due regard for the needs of the people as they have been expressed by their elected representatives, the members of the Legislature. As was stated by Chief Justice Marshall in Osborn v. United States Bank, 22 U.S. (9 Wheat.) 326, 6 L.Ed. 204 (1824):
"* * * Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature, or, in other words, to the will of the law." (at p. 381)
I find that the legislation in question, embracing both the appropriations under the annual service contracts and the contract for the Aldene Plan do not contravene the provisions of Art. VIII, Sec. III par. 3 of the New Jersey Constitution of 1947. I find that the legislation and its implementation has been enacted and has been carried out for the public purpose of providing for the safety, convenience and economic welfare of the people by attempting to insure continued adequate rail transportation for a great number of the citizens of our State. That this public purpose is the paramount factor of the legislation and all steps which have been taken to implement that legislation, and that the private advantage *283 which may accrue to any contracting railroad company is purely incidental and subordinate to the public purpose for which these laws have been adopted. I further find that the method of carrying out the public purpose of providing railroad transportation through the medium of the private railroad companies is proper, in that legally subsisting contracts have come into existence between the private instrumentalities and the State, supported by adequate consideration; further, that under the contracts which provide for payments to the railroads in connection with the furnishing of rail service, the use of public funds is adequately controlled by the supervision of the State Highway Commissioner.

C.
Plaintiffs next contend that L. 1962, c. 191, which provides for the Aldene Plan and the implementation thereof, constitutes a private, special and local law because it deals with a particular rerouting plan. The law, they contend, contravenes Art. IV, Sec. VII, par. 9 (8) and (9) of the New Jersey Constitution of 1947, restricting the Legislature in the passage of "private, special or local laws."
The basic test as to whether a particular law is private, special or local was set out in Budd v. Hancock, 66 N.J.L. 133 (Sup. Ct. 1901), as follows:
"A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places, or things from others, upon which, but for such limitation, it would operate. The test of a special law is the appropriateness of its provisions to the objects that it excludes." (at p. 135)
In Roe v. Kervick, supra, the Supreme Court in referring to the question of private or special legislation with respect to the law there under review, stated:
"A law is `general' (1) if the class of subjects established, recognized or regulated is distinguished by characteristics sufficiently marked and important to make it a class by itself, and (2) if it encompasses *284 all of the subjects which reasonably belong within the classification, and does not exclude any which naturally belong therein." (42 N.J., at p. 233)
Thus, it may readily be seen, the difference between a private, special or local law and a general enactment is a matter of classification. The purpose of the constitutional provision is not to prevent legislation where the Legislature decides upon a particular object, but to prevent arbitrary and discriminatory selection of a particular object where other objects existing should also be treated in like manner. If a law embraces the objects reasonably falling within a class which bears a reasonable relationship to the purpose of the legislation, and at the same time does not omit any which have equal reason to be included, the act is general. Harvey v. Essex County Board of Freeholders, 30 N.J. 381 (1959); Two Guys From Harrison v. Furman, 32 N.J. 199 (1960); Switz v. Kingsley, 37 N.J. 566 (1962).
The mere fact that a class will embrace but one entity which is distinct from all others, does not in itself mean that legislation affecting the one entity must be regarded as a special, private or local law. This principle is too obvious to require citation of authority. Here we are concerned with a track rerouting plan which will interconnect the Central with the Pennsylvania and the PATH rapid transit facilities by utilizing trackage of the Lehigh at a point near the Aldene Tower in Cranford. Turning to the exhibits which have been presented to the court by stipulation, it may be seen that the Aldene Plan has for many years been a major focal point of those concerned with state action to bring about capital improvements in our rail service network. All except one of the major rail commuter lines in the metropolitan area in the northeast quadrant of our State feed into the PATH lines. The exception is the Central. The Central brings some 13,000 commuters to the metropolitan area from Hunterdon, Somerset, Middlesex and Union Counties, with some 10,000 of these persons bound for New York City. Presently, these commuters are carried out to the Bayonne peninsula and then *285 northward to Jersey City, where they must make a ferry connection to travel to downtown New York City. The affidavits of Messrs. Shoemaker and Thomas, which have been filed with the court, show the heavy cost of maintaining this rail and allied ferry service.
The effect of this one exception to interconnection to the PATH lines is to deny to the commuters concerned the opportunity to connect into the rapid transit system now operated by the Port of New York authority, with the resulting accessibility to midtown New York City and the time savings thus involved.
With these considerations, the Aldene Plan was designated "Project A" in the 1960 Division of Railroad Transportation report; it was recommended forcefully in the 1962 Division report, and it was expressly found by our Legislature to be necessary to protect the State's present and planned investment in the master plan for highway construction. In his annual message to the Legislature on January 8, 1963, Governor Hughes expressed gratification for the enactment of the Aldene legislation; it was found by the engineering consultant firm of DeLeuw, Cather & Company to be the best plan of all considered. The president of the Central states in an affidavit filed in the cause that there is no practicable substitute for the Aldene Plan. Commissioner Palmer, the State Highway Commissioner, regards the Aldene Plan as "a keystone in the revitalization of railroad commuter service in our metropolitan area." He states that no other plan has the potential for improving the efficiency of the passenger service operations for the costs involved. This sentiment has been repeated by the president of the Board of Public Utility Commissioners of this State.
There has, of course, been opposition to the Aldene Plan from various quarters from time to time. As is apparent by this litigation, the major source of opposition has come from the City of Bayonne, which has raised a provincial voice in protest to the carrying out of the plan. Bayonne objects because *286 a full implementation of the plan would probably bring to pass the cessation of passenger service along the Central line from Bayonne to Jersey City and by ferry to downtown New York, since the better service into Newark and to New York through PATH would make it unnecessary for through commuters to use that part of the present service. Service would be continued into Bayonne for those destined for that city, as is provided in the contract between the Central and the State Highway Commissioner. Statistics which form part of the record here indicate that there is no significant demand for commuter service on the Central railroad running between Bayonne and Jersey City.
The Township of Hillside is another source of opposition. It objects because it fears that the operation of passenger train service which would pass through the township would constitute a hazard to the safety of its citizens. Particularly, it claims that the dead-ending of Long Avenue, which now crosses the tracks at grade, will create a problem by denying access there to fire and other emergency vehicles, and also by adding an increased burden to the crossings at other locations within the township.
These arguments against the plan are what might be termed the pragmatic considerations entering into this case. They do not, however, constitute a firm foundation for the assault made on the legal plane, i.e., that the Aldene legislation constitutes a private, local or special law. It is apparent from the record before me, that the subject matter of the Aldene legislation represents a sui generis consideration. There is nothing before me to indicate that there are more Aldene locations within this State. There is nothing to indicate that there are other situations similar to the physical characteristics presented, by way of adjacent juxtaposition of the lines of three railroads which offer the opportunity for speedy and economical interconnection. In my judgment the physical considerations, as well as the economic considerations, surrounding the entire Aldene scheme establish a subject which is distinguished by characteristics sufficiently *287 marked and important to make it a class by itself. Roe v. Kervick, supra, 42 N.J., at p. 233.

D.
Plaintiffs' next attack on the legislation is that the 1964 annual service contract legislation constitutes an improper delegation of Legislative power to the administrator, in that he is governed by improper or inadequate standards. While the maxim delegatus non potest delegare still has vitality, it must be applied by courts within the setting of present day concepts of government. As was stated in Ward v. Scott, 11 N.J. 117, 123 (1952), "exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power." When we consider the vast areas into which government, both federal and state, have been obliged to move because of the increasing complexities of modern society, brought about to a great extent by the increase of technical knowledge, it is readily apparent that both the Executive and Legislative Branches must resort to technicians and experts to carry out admittedly proper governmental functions. If it should be required that legislation authorizing or implementing a governmental scheme devised for the well-being of the people should contain detailed and precise rules of action for the persons entrusted with the operation of the plan, I am afraid that governmental programs requiring the use of administrators or experts would soon come to a halt  bogged down under a morass of legislation and requests for interpretation of the regulations embodied therein. If the Legislature is required to lay out detailed rules, it would be bound to thwart its own purpose. Legislators cannot be held to perfect anticipation in complex and changing circumstances. Broad principles often have to suffice. Sayreville v. Pennsylvania R.R., 26 N.J. 117 (1958).
Considering these principles relating to the delegation of powers, it will be seen that L. 1964, c. 88, the so-called *288 annual service contract legislation, sets forth adequate standards to control the activities of the agents of the State in dealing with the railroads. For example, in section 1 of the law, there are included such considerations as the avoidance of highway congestion, preserving economic values, promoting industrial potential, and preserving commuter and suburban type rail service. Section 4 of the act refers to the importance of conserving passenger service, with an eye to future years as well as current service, and limits the negotiated price by the deficit attributable to the service. In addition, the Commissioner's determination made pursuant to this law, a copy of which has been filed with the court, presents an informative statement of the multitude of considerations by which the Legislature has guided his actions. We cannot consider the 1964 law as standing alone. As has been developed earlier in this opinion, it is only one in an expanding series of legislative efforts calculated to preserve commuter rail transportation in this State, and to avoid a catastrophe which would be brought about by its termination. In implementation of the legislation which we have under consideration, there are on file in this cause voluminous reports made by various public officials, representing the continued efforts and studies on the part of these legislative agents in an effort to solve the transportation problem. These reports clearly indicate that the Legislature has given adequate guidelines to these officials. I conclude that the 1964 legislation contains adequate standards to guide those who are to carry out its purpose. There is no improper delegation.

E.
Plaintiffs' next argument deals with the validity of the Aldene Plan contract, purportedly executed pursuant to the provisions of L. 1962, c. 191. It is plaintiffs' contention that while the contract produced bears the date of June 29, 1964, it in fact did not come into existence until after July 1, 1964, the effective date of the repeal of the enabling statute.
*289 The facts surrounding the execution and delivery of the contract in question are gleaned from the depositions taken in the cause. There is no dispute as to them. On June 24, 1964 the president of the Central presented to the meeting of its board of directors a draft of a contract between the railroad and the State providing for the Aldene project, its financing by the State and the continuance of suburban passenger service, subject to the railroad's right to terminate the contract in the event that certain conditions were not met. The draft had been prepared by the State. Even though the president of the railroad had been cautioned that the Commissioner would not favor any escape clause whatsoever, the proposed contract as presented to and approved by the board of directors did contain an escape clause. This is reflected in the minutes authorizing execution.
On June 29, 1964 Mr. Craddock, a vice-president and general manager of the Central, and Mr. McLester, its general counsel, who is also a vice-president, met with representatives of the State in Trenton to execute the contract. Craddock and McLester informed Commissioner Palmer that they had some discretion as to what the exact terms might be upon which the Central would have a right to terminate the contract, but that they had no authority to execute a contract under which the Central would have no right of termination prior to the expiration of the full five-year period. The Commissioner advised the representatives of the Central that he would not execute a contract on behalf of the State which contained any provision giving the railroad a right to terminate the agreement. Despite the insistence of Craddock and McLester, the Commissioner was adamant in refusing to accede to the inclusion of a termination clause. After further discussion, the representatives agreed that they would execute the contract on behalf of the Central in the form presented to them by the Commissioner (without the termination clause), the same to be held in escrow until such time as they (Craddock and McLester) would check with the members of the executive committee of the Central's board of directors to *290 ascertain if they would authorize the execution of a contract containing no provision for termination by the company. It is clear that the representatives of the railroad informed the Commissioner that they had no authority to execute unconditionally the contract as presented to them by him.
The meeting between the railroad officials and the Commissioner ended at 1 P.M. During the afternoon and evening of June 29th and early in the morning of June 30 Messrs. Craddock and McLester spoke by telephone to members of the executive committee who, concededly, were not convened at one place in a meeting of that committee. It is undisputed, however, that each member of the executive committee was informed of Commissioner Palmer's attitude toward the execution by the State of a contract containing an escape clause, and, additionally, that each member of the executive committee indicated his approval to the execution of the contract without such a clause.
Following the round of telephone conversations and discussions just described, Messrs. Craddock and McLester again went to Trenton on June 30 and advised Commissioner Palmer, after some discussion, that they would release the contract from escrow, making it binding and effective as of that time. Subsequently, on July 22, 1964, at a meeting of the board of directors of the Central, the circumstances surrounding the execution of the contract with the State without the escape clause were discussed and thereupon ratified as executed.
Plaintiffs take the position that since, under the express instructions given to its representatives by the board of directors of the Central, there was no authority vested in them to execute a contract without an escape clause, it cannot be said that the State could rely upon the apparent authority of the Central representatives in attempting to enforce the contract should it later be attempted to be disclaimed by the Central. In addition, plaintiffs contend that since the board had authorized the representatives of the Central to execute a contract containing an escape clause and not a contract without *291 one, it would take a proper meeting of the executive committee of the board of directors, under the bylaws, to increase the authority of the Central's representatives so that a contract as proposed by the Commissioner, without the termination clause, coud have been executed.
The Central has conceded in this action that it regards the contract in question to be enforceable and binding as against it. The question of subsequent disclaimer must therefore be regarded as moot. Viewed in this light, I have serious doubt as to the standing of these plaintiffs to make the challenge to the contract, based upon intra-corporate affairs which is made here. None of the plaintiffs is a stockholder or other participant in the defendant railroad corporation. The individual taxpayers act as such, suing in the public interest. Without deciding the propriety of the standing of plaintiffs to question the vitality of this agreement, I merely point out that whatever defect there had been in the authority of the representatives of the railroad to execute the contract as proposed by the Commissioner without the termination clause, was obviously cured by the assent of the members of the executive committee upon being informed of this fact on June 29 and 30, as described above. While it is true that no physical meeting of the executive committee was held because of circumstances existing at the time, and also that the bylaws of the Central providing for the existence of the executive committee, when fairly read, called for a meeting physically of the committee for its deliberations, the circumstances here prohibiting the actual call of a meeting during what might be described as an emergency situation should not serve to frustrate legitimate corporate action. When the board of directors gave its assent to the execution of the contract with the State containing the termination clause, its members were fully aware of Commissioner Palmer's thinking with respect to that provision. While it is true that the form of contract they approved contained a termination provision, it is reasonable to assume that they expected opposition from the Commissioner, and, indeed, *292 that the Commissioner might refuse to accept the agreement which they proposed, as he did. There is nothing in the minutes of the meeting of the directors, or in the depositions, which would indicate in any manner that the board of directors or the executive committee would flatly refuse to accept the contract proposed by the Commissioner. I find, under the facts as presented in this case, that the activities of the railroad's representatives with the individual members of the executive committee were sufficient to vest them with the authority to execute the contract in question containing the termination clause; in addition, I find that the act of ratification of the board of directors, albeit long after the effective date of the contract, was sufficient to remove any cloud which may have existed, although I do not find one to have existed, over the vitality of the agreement.

F.
Finally, plaintiffs advance several additional arguments, all seeking to persuade that some facet of the legislative scheme, or the contracts executed pursuant thereto, are invalid. None, in my judgment, has merit. The contention that the Commissioner was obliged to hold a hearing before executing the Aldene contracts, under L. 1960, c. 66, § 3, may clearly be answered by stating that the section in question dealt with determinations of approved passenger service under the 1960 law and had no bearing on the Aldene contracts.
The argument that the Aldene Plan contracts are illusory because the railroad's obligation is expressed thereunder in terms of an agreement to "negotiate" annual service contracts pursuant to L. 1964, c. 88, seems to require a finding by the court that the railroad's obligations to the State under the Aldene Plan should be in perpetuity or some approximation thereof. The program of which the Aldene Plan is but a part does not purport to be a permanent solution of the rail transportation problem in this State. The *293 whole purpose of the legislation, at this juncture, is to preserve the status quo, thus giving time for cool and reflective study of the problem by both the State and the private carriers. Plaintiffs' reading of the contracts, and the laws under which they have been executed, is highly technical and certainly not conducive to satisfaction of the legislative purpose which they reflect.
With respect to the alleged usurpation of the discontinuance authority contained in L. 1960, c. 66, § 10, and L. 1964, c. 88, § 9, vesting in the State Highway Commissioner authority over discontinuances of rail service, the argument advanced is completely answered by the decision of our own Supreme Court in Sprissler v. Pennsylvania-Reading Seashore Lines, 45 N.J. 127 (1965).
The last argument, that the contract with the Central which in part provides that the railroad "agrees to pursue diligently efforts to secure any authorizations from regulatory agencies required to accomplish its obligations under this agreement," is no contract at all because it requires the approval of third parties, must also be rejected.[8] We are not dealing here with professional football teams, or the supply of commercial services or commodities. We are dealing with economic life of a large segment of the population of our State. It is unrealistic, in my judgment, to view the problem presented here under the standards imposed by the law for commercial or industrial undertakings. The regulatory agencies, whose approval must be obtained under the program advanced here, are equally dedicated to the public good, particularly to the assurance of efficient and sufficient public transportation. There is no reason to believe, much less is *294 anything shown, that the conditions will in actuality interfere with the carrying out of the legislative plan involved here.
For the reasons I have expressed, therefore, I find that the laws questioned here do not contravene the provisions of Art. VIII, Sec. III, par. 3 of the Constitution of 1947, and that the contracts executed pursuant thereto are valid and subsisting obligations of the parties concerned.
A judgment embodying the conclusions reached in this opinion may be submitted by the parties on notice or by consent. No costs.
NOTES
[1] New Jersey's Rail Transportation Problem. Report to Governor Robert B. Meyner and the New Jersey State Legislature (April 1960).
[2] Ibid., at p. 10.
[3] Will We Emerge? Second Report and Recommendations (January, 1962).
[4] "Determination Made Pursuant to Chapter 88, L. 1964 of Financial Results to Railroads and Ferry Companies From Providing Passenger Service and Recommendations to Offset Losses Shown. Fiscal year 1964-65."
[5] Ibid., at p. 9.
[6] The plaintiffs also seem to contend that the legislation and programs in implementation thereunder, also violate the provisions of Art. VIII, Sec. II, Par. 1, and Art. VIII, Sec. III, Par. 2 of our Constitution. The former section deals with the credit of the State and the latter with the activities of political subdivisions of the State with respect to dealings with private corporations or association. Neither of these constitutional sections seems to be apposite to the question presently before the court.
[7] No significant discussion with respect to the adoption of this paragraph is found in the Proceedings of the 1947 Constitutional Convention. One might well question whether the "evils" dealt with in 1875 were in the minds of the framers of the 1947 compact.
[8] Plaintiffs cite in support of this position cases such as: Detroit Football Company v. Robinson, 186 F. Supp. 933, 935 (D.C. La. 1960), aff'd 283 F.2d 657 (5 Cir. 1960); Architectural Decorating Co. v. Shaw, 274 Ill. App. 260; McCray v. Sapulpa Petroleum Co., 102 Okl. 108, 226 P. 875 (1924); Barnes v. Red Bayou Oil Co., Inc., 271 F. 297 (5 Cir. 1921); Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co., 4 W.W. Harr. 567, 156 A. 350 (Del. Super. 1931).